## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHARACTER TECHNOLOGIES, INC., a Delaware corporation,<br><br>     Plaintiff,<br><br>v.<br><br>APPLIED DIGITAL CORPORATION, a Nevada corporation,<br><br>     Defendant. | C.A. No.:<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Character Technologies, Inc. ("Plaintiff" or "Character"), by and through the undersigned counsel, hereby brings this action for declaratory judgment, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and fraud against Applied Digital Corporation ("Defendant" or "Applied") and alleges as follows:

## INTRODUCTION

1. Character brings this action for declaratory judgment to enforce an agreement between the parties that released Character from its contractual obligations to make payments to Applied, and to hold Applied accountable for its fraudulent and bad-faith conduct while negotiating that agreement. Character, a leading artificial intelligence ("AI") platform, was Applied's first major customer and leased exclusive use of physical banks, or "clusters," of high-powered computers from Applied for use in Character's AI development efforts. Approximately a year into the lease, Applied approached Character to negotiate an early termination of the lease and a return of Character's leased clusters, presumably so that Applied could rent them to other customers. The parties engaged in negotiations, both oral and via written text messages, and

reached an agreement that amended the contract governing their relationship such that Character would return the clusters on September 4, 2024, and would no longer be liable for any further payments to Applied (the "Agreement").  The terms of the Agreement were memorialized in the parties' communications and in a written addendum to the original contract.  Consistent with the Agreement, Character returned exclusive control of the leased clusters to Applied on September 3, 2024.  Applied, however, went back on its word—it later turned around and demanded continued payment for the very compute clusters that Character *had stopped using at Applied's request.* Applied has continued to seek millions of dollars in payments from Character, going so far as to threaten litigation to recover what Applied characterizes as past-due payments.

2.      Applied presumably believed it could re-lease these clusters to a new customer. When Applied's gamble did not pay off, it turned back to Character seeking payment for services which it had induced Character to give up.  Throughout negotiations, Applied fraudulently induced Character to give up its exclusive contractual right to use the leased clusters, all the while intending to continue holding Character liable for the cost of using those clusters.  Character brings this action seeking entry of declaratory judgment that the Agreement was a binding and enforceable agreement that excused Character's obligation to make further payments to Applied, or in the alternative, that Character's obligation to make further payments to Applied was excused by Applied's own breach of the parties' original contract.  Character also seeks to hold Applied liable for its fraudulent and bad faith conduct in negotiating the Agreement.

## PARTIES

3.      Plaintiff Character Technologies, Inc. is a Delaware corporation with its principal place of business located at 1152 700 El Camino Real, Suite 120, Menlo Park, California 94025.

4.      Defendant Applied Digital Corporation is a Nevada corporation with its principal

place of business located at 3811 Turtle Creek Blvd., Suite 2100, Dallas, Texas 75219.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to both 28 U.S.C. § 1132(a), because there is complete diversity of citizenship between Character and Applied and because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the Declaratory Judgment Act, 28 U.S.C. § 2201(a), because an actual controversy exists between Character and Applied based on Applied's threat of litigation to recover payments from Character under the parties' original contract.

6.      This Court has personal jurisdiction over the parties because the parties consented to personal jurisdiction in Delaware.  In a Service Level Agreement (SLA) Supportive to Customer Terms of Service Contract (the "Contract"), a true and correct copy of which is attached hereto as Exhibit A, the parties agreed that any dispute "arising from or related to" the Contract would "be subject to the exclusive jurisdiction of the courts in Delaware, without giving effect to any choice of law or conflict of law provisions."  Ex. A at 3.  The Contract further provides that the Contract "shall be governed and construed in accordance with the laws of the State of Delaware."  *Id.*

7.      This dispute "aris[es] from or relate[s] to" the Contract.  Applied asserts Character has breached its obligations under the Contract by failing to remit payments for the right to use certain computing clusters.  Character, as discussed further herein, alleges the Agreement, which worked as an amendment to the Contract, released Character from its payment obligations upon its relinquishment of the leased computing clusters back to Applied.  As such, the parties have consented to have this dispute heard in the District of Delaware.

8.      Because the parties have consented to personal jurisdiction in the District of Delaware, venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(3).

## **FACTUAL ALLEGATIONS**

9.      Character was founded in 2021 by AI pioneers Noam Shazeer and Daniel De Freitas.  It utilizes large language and deep learning algorithms to provide its users with a personalized AI experience through a conversational artificial intelligence platform that can recognize, summarize, translate, predict, and generate text and other content.  Users can use Character's platform to build their own, personalized "Characters," which they can engage with or share with others.

10.      Applied is an information technology company that sells access to general processing units ("GPUs") located in various data centers to offer cloud data and high-performance computing services to AI companies.  In or around 2023, Character required additional computing power to support its growing AI systems, and the parties entered into the Contract whereby Character rented exclusive access to clusters of GPUs.  Notably, Character was one of Applied's first    major    customers.    *See*    https://ir.applieddigital.com/news-events/press-releases/detail/65/applied-digital-onboards-first-major-customer-for-cloud    ("Applied    Digital Onboards First Major Customer for Cloud Service").

11.      The Contract, dated June 28, 2023, provides that, in exchange for Character's agreement to pay Applied an hourly fee assessed on a 24 hour per-day, 7 day per-week basis, Applied would provide Character with exclusive access to a defined number of clusters.  *See, e.g.*, Ex. A at 1, 6.  Character provided Applied with a prepayment of $22,491,979.78 toward the total value of the Contract, to be drawn down until it ran out, at which point Character would pay any remaining amounts on a per-month basis.  *Id.* at 6.  Applied sent quarterly invoices to Character detailing charges accrued and the corresponding reduction in Character's prepayment amount.

12.      On or about December 5, 2023, Character requested, and Applied provided, access

to additional GPUs, at which time Character made an additional payment of $8,073,216.00 to Applied.

13.    The parties entered into a second addendum to the Contract (the "Second Addendum") to address an update in pricing and payment terms for certain clusters.  A true and correct copy of the Second Addendum is attached hereto as Exhibit B.

## APPLIED OFFERS TO END THE CONTRACT EARLY

14.    On or around June 3, 2024, after Character had been leasing compute from Applied for about a year, Applied's CEO, Wesley Cummins, reached out to Character's Vice President of Engineering, Myle Ott.  Mr. Cummins asked Mr. Ott whether Character would be interested in returning its clusters and ending the Contract early.

15.    Mr. Cummins proposed that Character could return its exclusive access to the clusters in or about August 2024, when Character's "prepayment" amount was set to run out.  In response to a question from Mr. Ott, Mr. Cummins suggested that Applied could provide these clusters to another customer and pitched the prospect as a win-win.

16.    This was a unilateral suggestion from Applied.  Character did not initiate any discussion about giving the clusters back to Applied or shortening the term of the lease.

17.    Mr. Ott brought Mr. Cummins' proposal back to Character and discussed it internally with other Character employees.  Those employees expressed excitement at the opportunity to take Mr. Cummins up on his offer and end the lease early for various reasons.  The Character team had experienced performance issues with the Applied GPUs throughout the term of the lease, and the employees expressed they were open to giving up on Applied's compute and relying entirely on other Google Cloud Platform ("GCP") compute that Character leased from Google.

18.    Mr. Ott responded to Mr. Cummins on June 12, 2024.  A true and correct copy of Mr. Cummins and Mr. Ott's text conversation is attached hereto as Exhibit C.  Mr. Ott's text message to Mr. Cummins reads as follows:

> Hey, following up on our chat last week about evening out the prepayment and returning the cluster early. Our infra team was pretty thrilled about the idea, since they've had trouble managing multiple environments and would like to consolidate on gcp. Still make sense on your end?

Ex. C.

19.    Mr. Cummins' written response was clear and unequivocal: "***Yes.*** This will take a little time. Weeks not months. ***But you should plan for it.***"  Ex. C (emphasis added).  Mr. Ott responded to the message with a thumbs up emoji.  *Id.*  Mr. Cummins went on to note that he understood Character's excitement at his offer: "I'm not a deep tech guy.  But has to be hard running gpu and tpu"—in other words, using compute from both Applied and another provider. *Id.*  Mr. Cummins further voiced his heartfelt appreciation for Character, stating: "Just so you know, you bet on us very early and I know there was a lot of pain involved in that.  If there is anything we can do to help you I will do that."  *Id.*

20.    It would have been more than reasonable for Character to rely solely on Mr. Cummins' representation that Character should "plan for" the decommission of its clusters and the early termination of the Contract, including Character's payment obligations—*without precondition*.  However, Mr. Ott followed up *again* to make absolutely certain that Applied was still comfortable with Character returning its clusters and ending the lease early.  On July 8, 2024, Mr. Ott texted Mr. Cummins the following:

> Hey, hope you're well and had a nice holiday weekend. Wanted to check in on cluster plans. If I'm doing math right, prepayments take us to the end of Aug/early Sept. If that sounds right, ***shall we plan to return the cluster at***

*the end of Aug.?*

Ex. C (emphasis added).

21.     Mr. Cummins replied on July 29, 2025, and *again* confirmed the terms of the Agreement, noting that he had discussed the Agreement with Applied's Executive Vice President of Strategic Finance, Syed A. Raza, and that Applied would take back the clusters and release Character from any further payment obligations under the Contract and its Addendums: "Thanks myle. Spoke to Raza this morning. *Sounds like we are planning to take the clusters back end of August ish [sic].*" Ex. C (emphasis added).

22.     Mr. Ott also spoke to Mr. Raza on July 29. Mr. Raza further confirmed that it was Applied's intent to affirmatively end the Contract when Character's existing prepayments ended, and promised to get back to Character with a precise end date. Mr. Raza further agreed to update the Contract and asked that Character draft an amendment to reflect the reduction in Contract term from twenty-four months to the end of prepayment.

23.     Later that same day, consistent with his representations, Mr. Raza emailed Mr. Ott and provided a more specific end date, stating "[p]repayment is estimated to run out by the end of day September 4th, 2024, for both clusters combined." Mr. Ott responded hours later, stating that Character would "plan for Sept 4 and send an updated draft addendum your way shortly." A few hours later, Mr. Ott followed up, noting "[w]e drafted an addendum reflecting what we discussed. Adding [Character's General Counsel] from our side to address any needed redlines." A true and correct copy of Mr. Raza and Mr. Ott's email exchange is attached hereto as Exhibit D.

**CHARACTER SENDS ADDENDUM REFLECTING THE PARTIES' AGREEMENT**

24.     At this point, Character already had Applied's affirmative assent to the Agreement in writing—*i.e.*, multiple confirmatory messages from Applied's CEO. Nonetheless, consistent with Mr. Ott's email and Mr. Raza's request, on July 29, 2024, Character sent an addendum

memorializing the terms that Mr. Cummins and Mr. Ott had agreed to (the "Third Addendum"). A true and correct copy of the Third Addendum is attached hereto as Exhibit E.

25.    In relevant part, the Third Addendum reads as follows:

1.    The two prepayments described above [which Character had made in full] ***shall constitute the full payment of Customer under this Addendum and the Terms of Service.***

2.    In consideration of those payments, [Character] shall have the right to use  the Phase 1 and Phase II GPUs described on page 1 of this addendum through September 4, 2024.

3.    At midnight on September 4, 2024: (a) [Customer's] right to use the Phase 1 and Phase II GPUs shall cease; and (b) this Addendum and the Terms of   Service shall be terminated (except to the extent the parties agreed that particular terms survive termination).

4.    Both parties will be whole, and neither party shall have the right to recover payments or other monies from the other (except to the extent damages later become apparent under provisions of the Terms of Service, if any, that survive termination).

Ex. E at 2 (emphasis added).

26.    The Third Addendum accurately memorialized the terms to which Mr. Cummins and Mr. Ott had agreed.  Applied never objected to the Third Addendum.  Instead, in response to Character sending the Third Addendum, Mr. Raza wrote back on August 7, 2024, and said: "Thanks for checking back in.  Acknowledged and reviewing on our side."  Ex. D at 3.  After not hearing back from Applied, Character again reached out on or about August 13, 2024, to check in on the Third Addendum.  Ex. D at 2.  Mr. Raza's response simply noted that he would "touch base with the team and confirm the legal review comments" and requested that Character "note any timelines for me to request expediting as needed."  Ex. D at 1.  Applied gave no indication that Character had mischaracterized the terms of the Agreement or that the Third Addendum was wrong

in any way.

## CHARACTER DECOMMISSIONS THE CLUSTERS AND
## CONFIRMS THE LEASE HAS ENDED

27.     Consistent with the terms of the Agreement, as outlined in the Third Addendum, on September 3—one day prior to the date Mr. Raza indicated Character's prepayment would "run out"—Character began the process to return the leased clusters to Applied.

28.     On September 3, 2024, a Character engineer, Yiran Wang, sent a Slack message to Applied, stating: "technically our contract[] ends today? How do you guys want to proceed with decommissioning of the cluster?"  An Applied employee, Gabriel Diaz, replied and said that he had assigned the job to another Applied employee, Mark Dalton.  Mr. Dalton then replied to Mr. Wang: "Just to confirm you have any/all data you need copied to another location/backed up?"  Mr. Wang replied in the affirmative.  A true and correct copy of the Slack messages between Mr. Wang, Mr. Diaz and Mr. Dalton is attached hereto as Exhibit F.

29.     Character thereafter ceased to use the Applied clusters and, on information and belief, Applied terminated Character's exclusive access to them.  Further, in the same September 3, 2024, Slack message chain between Character's Yiran Wang and Applied's Gabriel Diaz, Mr. Wang requested that Applied "format weka[1] and all disks," which would remove Character's data from the clusters.  Mr. Dalton confirmed that he would make that request to his team.  *See* Ex. G. On information and belief, Applied followed through with Mr. Wang's request and deleted

---

[1] "weka" stands for "Waikato Environment for Knowledge Analysis," an open-source software program for the collection of machine learning algorithms for data mining and modeling.  *See* https://www.leadrpro.com/blog/what-is-weka-comprehensive-guide-to-the-popular-machine-learning-software#:~:text=The%20name%20Weka%20stands%20for,rule%20mining% 2C%20and%20many%20others.

Character's data from its systems.  Applied's deletion of Character's data rendered those clusters essentially useless to Character.

## APPLIED GOES BACK ON ITS WORD AND
## SEEKS FURTHER PAYMENTS FROM CHARACTER

30.    In short, *Applied itself* asked to take back Character's computing clusters and release Character from the Contract, and agreed in writing to do so—presumably because Applied believed it could re-lease those clusters to a new customer at a higher price.  When Applied's gamble did not pay off, however, it turned back to Character seeking payment for the very services which it had induced Character to give up.

31.    On November 15, 2024, over two months after Character relinquished control of the clusters back to Applied, Applied sent Character an invoice for what it characterized as the full amount due for the remainder of the parties' Contract—$35,410,919.42.

32.    Confused, Character responded that there must have been a miscommunication, because per the Agreement, as reflected in the Third Addendum, Character "completed our service with Applied Digital on September 3, 2024," and further noted that there would "be no further payments made."

33.    On February 11, 2025, Character received a demand letter from Applied's General Counsel, Mark Chavez.  Mr. Chavez followed up on February 20, 2025, indicating Applied's intent to "pursue any and all legal remedies at its disposal," to which Character's General Counsel responded, summarizing the terms of the parties' agreement laid out above and expressing disappointment that Applied would go back on an agreement that Applied itself had suggested.

34.    Applied sent another letter to Character's General Counsel on March 12, 2025, this time through outside counsel.  This time Applied alleged, *for the very first time*, that Applied's

agreement to release Character from its obligations under the Contract had a condition precedent—

that Character would only be released if Applied were able to locate a new customer who would

assume the GPUs assigned to Character.  Applied alleged it was never able to find a customer and

as such, Character remained on the hook to pay for computing power to which Character had long

since relinquished its access.  Applied's outside counsel further argued that because the Agreement

was not in a signed, written instrument, it was not binding on Applied.

35.     This assertion from Applied—that there had been a condition precedent wherein

Applied had to find another customer before the contract ended—was pulled out of thin air.  It did

not exist and had never been mentioned before.  Character said as much: responding through

counsel, Character stated that not only had Applied never raised this condition precedent during

negotiations, but that based on Applied's representations and actions throughout negotiation of the

Agreement—including through written text messages from its CEO, Applied's failure to respond

***at all*** to the Third Addendum, and Character's relinquishment of the leased clusters back to

Applied—the Agreement was binding on the parties and that Applied could not seek to unilaterally

renege now.

36.     Applied's response, sent on June 5, 2025, largely ignored the substance of

Character's position and simply provided Character with a draft complaint and a threat to file it

within ten days if Character refused to remit payment.  A true and correct copy of Applied's

response, including its draft complaint, is attached hereto as Exhibit G.

## APPLIED DEPRIVED CHARACTER OF THE BENEFITS
## FOR WHICH IT HAD BARGAINED

37.     It is readily apparent that Applied's assertion that the Agreement was conditioned

on a (non-existent) condition precedent was made for litigation.  However, even if Applied had

actually believed this, its failure to raise its belief during the parties' negotiations induced Character to relinquish its exclusive control of the leased clusters and to stop making payments that would have otherwise been owed under the Contract. In so doing, Applied deprived Character of its bargained for benefit under the Contract—"dedicated" clusters. *See* Ex. A at 1.

38.     Had Applied ever informed Character of its belief that the Agreement was subject to this condition precedent, Character could have stopped Applied from deleting its data from the leased clusters, and would have been able to continue utilizing them past September 4, 2024, as opposed to relinquishing control back to Applied and having its data deleted.

39.     Further, Character could have sought either to offset the amounts owed to Applied under the Contract or to potentially mitigate the impact of any unused GPU capacity for which it was paying.

40.     Applied, in sum, pulled a bait-and-switch on Character. Applied convinced Character to give back the leased computing clusters and agreed to end the Contract early, deleted Character's data from those clusters, making it impractical, if not impossible, for Character to make use of them going forward, and then tried to seek payment anyway. Applied's bad-faith argument that it believed the Agreement was subject to a condition precedent—even if true—does not help it because it failed to ever tell Character about this supposed condition, causing Character to give up its use of the leased computing clusters. Applied's threat to sue left Character with no choice but to bring this action to vindicate its rights under the Agreement.

## COUNT I

### (Declaratory Judgment of No Breach of Contract)

41.     Character incorporates herein each of the paragraphs above by reference as though fully set forth herein.

42.     Character and Applied are parties to the Contract and its Addendums, whereby Applied agreed to provide Character with exclusive access to a series of clusters of GPUs in exchange for Character's agreement to pay for that access.

43.     Applied has accused Character of breaching its obligations under the Contract and its Addendums by failing to make payments after its prepayment amount was fully drawn. Applied, through its outside counsel, has indicated its intent to imminently file a complaint against Character alleging breach of contract, anticipatory repudiation, and breach of the covenant of good faith and fair dealing.  *See, e.g.*, Ex. G.

44.     Based on Applied's allegation that Character has breached its contractual obligations and its intent to imminently file a complaint, there are real, adverse interests between the parties such that the matter is ripe for judicial determination.

45.     Character seeks declaratory judgment that it has not breached the Contract because Character and Applied amended their Contract through the Agreement, which extinguished Character's obligations to continue making payments to Applied and treated Character's prepayments as payment in full for the services provided under the Contract and relieved Applied of continuing to provide the exclusive access to its GPUs.

46.     As described in more detail above, in or about June 2024, Applied, through its CEO, Mr. Cummins, unilaterally offered to release Character from its obligations under the Contract upon the exhaustion of Character's prepayment amounts, in exchange for Character's agreement to relinquish its exclusive control of its leased computing clusters.

47.     After discussing Applied's offer internally, Character responded that it would be "thrilled" to accept Applied's offer and inquired as to whether Applied still intended to move forward as discussed.  Mr. Cummins replied in the affirmative and indicated that Character should

"plan for it."

48.    Character consistently verified that Applied intended to move forward with the Agreement, including through additional text messages sent to Mr. Cummins in July 2024. Again, Mr. Cummins responded affirmatively, indicating he had discussed the matter with Applied's Executive Vice President of Strategic Finance, Mr. Raza, and that Applied planned to take back Character's computing clusters at the end of August 2024.

49.    At this point, Character and Applied had agreed to the essential terms in the Agreement: Character would relinquish exclusive control of the leased clusters back to Applied and, in exchange, Applied would terminate the Contract, including Character's obligation to make ongoing payments. At no point during the parties' negotiations did Applied ever indicate there were further material terms left to negotiate, let alone inform Character of Applied's purported belief that the Agreement was subject to a condition precedent.

50.    The Agreement and its terms were further confirmed in the weeks that followed by an unambiguous series of writings and actions by both parties.

51.    First, Mr. Raza further represented to Character that Applied intended to end the Contract when Character's prepayments ended, and agreed to update the Contract to reflect the early termination date. Second, Character memorialized the Agreement in the Third Addendum, which it sent to Applied on July 29, 2024. At no point after Character sent the Third Addendum to Applied did Applied object to the Agreement as reflected in that document, nor did Applied inform Character of its belief that the Agreement was subject to a condition precedent. Third, Character's engineers confirmed to Applied's engineers that the Contract was ending on September 4, 2025, and that Character was ceasing use of the cluster. Fourth, Character and Applied's engineers took steps to, and in fact did, decommission the cluster. These events created

an unbroken chain of confirmation that Applied's CEO had meant what he said when he agreed to

end the Contract in exchange for Character's return of exclusive access to the leased computing

clusters.

52.    Character relied on Applied's prior statements, and took steps to effectuate the

Agreement, including relinquishing exclusive control of its computing clusters back to Applied.

Consistent with the Agreement, Applied proceeded to delete Character's data from the leased

clusters, effectively rendering them useless to Character.  In both word and deed, the parties'

conduct was entirely consistent with Character's position that the Agreement was bringing both

parties' contractual obligations to a conclusive end on September 4, 2024, without additional

condition(s).

53.    Character seeks a declaration that the Agreement constituted a valid and

enforceable contract between Character and Applied that modified the terms of the parties'

Contract, extinguished any obligations that Character may have had to make any payment beyond

its prepayment, which was exhausted on September 4, 2024 (according to Applied), and similarly

relieved Applied of providing Character with access to its GPUs after September 4, 2024.

54.    In the alternative, Character seeks declaratory judgment that it has not breached the

Contract because Applied breached the Contract first by failing to provide Character with

exclusive access to the leased computing clusters after September 4, 2024, thereby excusing

Character from any future performance.

55.    Pursuant to the Contract, Applied agreed to provide Character with "Bare Metal

GPU services, including *dedicated* GPU hardware resources[.]"  *See* Ex. A at 1 (emphasis added).

This included an agreement to maintain "an uptime of 98.8% for [Character's] Bare Metal GPU

services," indicating that Character should receive close to 100% access, at all times, to the leased

computing clusters. *See id.* The Contract further provides that, should Applied fail to deliver exclusive access to the leased computing clusters, Character "has the right to immediately terminate" the Contract "either in whole or in part." *Id.* at 6.

56.     As of September 4, 2024, Character relinquished its exclusive access to the leased computing clusters back to Applied in reliance on its Agreement with Applied, and Applied formatted the computing clusters to delete any trace of Character's data from those clusters consistent with that Agreement. Therefore, Applied did not provide any "dedicated GPU hardware resources," as required under the Contract, after this September 4, 2024. Even if Character had retained some non-exclusive access to the leased clusters, Applied's deletion of Character's data made it impractical, if not impossible, for Character to continue making use of those clusters.

57.     Character seeks a declaration that Applied's failure to provide "dedicated GPU hardware resources" to Character after September 4, 2024, constituted a breach of the Contract, which served to excuse Character from its contractual obligations to make ongoing payments for access to those clusters.

## COUNT II

### (Breach of the Implied Duty of Good Faith and Fair Dealing)

58.     Character incorporates herein each of the paragraphs above by reference as though fully set forth herein.

59.     The Agreement contained an implied covenant of good faith and fair dealing. That covenant obligated Applied to deal fairly and in good faith with Character with respect to the Agreement and Character's return of exclusive access to its leased computing clusters.

60.     Applied breached that covenant of good faith and fair dealing by fraudulently concealing and fraudulently failing to disclose its alleged belief that the Agreement was subject to

an alleged condition precedent requiring Applied to first find a replacement customer before Character would be released from its obligations under the Contract.  Applied likewise breached the covenant of good faith and fair dealing by fraudulently concealing and fraudulently failing to disclose to Character that Applied had failed to find a replacement customer prior to Character relinquishing its use of the GPUs, such that Character would remain liable for payments even after relinquishing its exclusive access to the leased computing clusters.

61.    Throughout negotiation of the Agreement, Applied affirmatively represented that Character should "plan for" the return of its leased computing clusters in exchange for an early termination of the Contract.  Applied confirmed multiple times, without condition, that Applied would be retaking the computing clusters at the end of August 2024 and that would end Character's payment obligation.

62.    To the extent Applied believed that Character's return of the computing clusters, and the early termination of the Contract, was contingent upon Applied finding a replacement customer to take over Character's computing clusters, Applied had an affirmative duty to timely inform Character of that contingency.  However, despite Character checking in with Applied multiple times in the Summer of 2024 to make sure that Applied wished to proceed, and despite sending the Third Addendum that reflected what Character understood the Agreement to be, Applied failed to raise the alleged condition precedent to Character.

63.    Further, at the time Character returned its leased computing clusters to Applied, Applied had an affirmative duty to, at the very least, inform Character that it intended to continue to hold Character liable for full payment under the contract because Applied had failed to find a replacement customer to take over Character's clusters—*if it actually believed that was the agreement of the parties.*  Instead, Applied took back Character's leased clusters without condition

and allowed Character to operate under the impression that, pursuant to the Agreement, its payment obligations under the Contract were extinguished.

64.    Applied's withholding of relevant information pertaining to the Agreement, as well as withholding its intent to continue to seek full payment from Character after Character relinquished exclusive control of the leased clusters back to Applied, was done in bad faith and deprived Character of the benefits for which it negotiated under both the Contract and the Agreement.

## COUNT III

### (Promissory Estoppel)

65.    Character incorporates herein each of the paragraphs above by reference as though fully set forth herein.

66.    To the extent the Agreement is found not to be a binding, enforceable contract, Applied's claim that Character breached the parties' Contract by failing to make ongoing payments after Character relinquished its exclusive access to its leased computing clusters on September 4, 2024, is barred by the doctrine of promissory estoppel.

67.    Applied, through its CEO, Mr. Cummins, affirmatively promised to release Character from its obligations under the Contract in exchange for Character's agreement to return its leased computing clusters to Applied.  Indeed, Mr. Cummins made this offer without any prompting from Character.  When Character followed up on Mr. Cummins' promise, he told Character that it should "plan for it" and further confirmed that Applied would take back the computing clusters at the end of August 2024.  The communications were reflected in writings between the parties.

68.    Based on its CEO's statements, Applied should have expected, and did expect,

Character to relinquish its exclusive access to its leased computing clusters at or around the end of August 2024.

69.     It was reasonable for Character to rely on Applied's promise, made through its CEO, to release Character from its obligations under the Contract.  Character followed up with Mr. Cummins multiple times to confirm that Applied intended to move forward with its promise. At each juncture, Applied responded in the affirmative and made no mention of the alleged condition precedent that Applied needed to find a replacement customer before it would release Character from the Contract.

70.     In reliance on Applied's promise, Character relinquished its exclusive control of the leased computing clusters on September 3, 2024, and stopped making payments under the Contract.   Further, Applied formatted Character's computing clusters, which deleted all of Character's data stored on those clusters, effectively rendering those clusters useless to Character going forward.  Finally, Character subsequently obtained millions of dollars of additional compute from other third-party providers to meet its compute needs—a step Character would never have taken had it believed it could still use, and still had to pay for, the Applied computing clusters.

71.     Applied did not intend to keep its promise to Character and instead laid in wait for Character to return the leased clusters and stop making payments under the Contract before alleging that its promise was actually subject to a condition precedent requiring Applied to find a replacement customer before releasing Character from its obligations.   At no time during the parties' negotiations did Applied indicate that its promise to release Character from its obligations was contingent upon finding a new customer to take over Character's clusters, nor did it inform Character that Applied had failed to satisfy its hidden condition precedent.  Applied's silence is particularly telling because it was provided with the Third Addendum, which did not include any

such precondition.  Still Applied said nothing while Character proceeded to give up the benefit of its contractual bargain.

72.     It would be unjust to allow Applied to sit silently and lie in wait understanding that Character did not believe the Agreement included any condition precedent (because it did not), only to back out of its promise once Character had acted to its detriment.  Character has already returned the leased clusters to Applied and no longer has access to them.  Requiring Character to pay full price for computing power that it has not used, and indeed, given Applied deleted Character's data from the leased clusters, could not use, would be unfair, particularly in light of Applied's promises discussed above.

## COUNT IV

### (Fraud)

73.     Character incorporates herein each of the paragraphs above by reference as though fully set forth herein.

74.     Applied fraudulently concealed, or withheld, material information from Character that, based on the parties' contractual relationship it was under a duty to disclose, to induce Character to relinquish its exclusive access to the leased computing clusters.

75.     During the parties' negotiation of the Agreement, Applied withheld its belief that the Agreement was subject to a condition precedent requiring that Applied locate a replacement customer to take over Character's leased computing clusters before Character would be released from its obligations under the Contract.

76.     In light of the parties' contractual relationship, Applied was under an affirmative duty to disclose its belief that the Agreement was subject to a condition precedent.  Applied had several opportunities to disclose its belief that the Agreement was subject to this condition

precedent, but failed to do so.

77.     First, when Mr. Cummins initially reached out to Mr. Ott on or about June 3, 2024, to inquire as to whether Character would be interested in returning the leased clusters, and ending the Contract early, Mr. Cummins indicated that Applied was exploring interest from another potential customer, but did not disclose that Applied's offer to release Character was contingent on Applied securing that customer.

78.     Second, when Mr. Cummins responded to Mr. Ott's June 12, 2024, message assenting to Mr. Cummins' initial offer, Mr. Cummins responded "***Yes***" and told Character they should "plan for it."  To the extent Applied believed the Agreement was subject to a condition precedent at this point, it was under an affirmative duty to disclose that belief to prevent Mr. Cummins' affirmative representation that Character should "plan for it" from being misleading. Again, Applied did not disclose its belief that a condition precedent applied to the Agreement.

79.     Third, when Mr. Raza spoke to Mr. Ott on July 29, 2024, representing that Applied intended to end the Contract when Character's prepayment ran out, and requesting that Character draft an amendment to the Contract reflecting the Agreement, Applied again had a duty to disclose its belief that Applied's agreement to end the Contract early was subject to a condition precedent, in order to prevent Mr. Raza's representation from being misleading.  Again, Applied did not disclose its belief that a condition precedent applied to the Agreement.

80.     Fourth, when Character sent the Third Addendum reflecting the essential terms of the Agreement to Applied on July 29, 2024, Applied, again, had the opportunity and obligation to disclose its purported belief that the Third Addendum did not accurately reflect the terms of the Agreement.  Applied failed to do so, and instead remained silent.

81.     Applied also withheld that it had failed to locate a replacement customer prior to

Character relinquishing its control of the clusters, and further withheld its intent to continue to hold Character liable for full payment under the Contract regardless of whether Character continued utilizing the leased computing clusters or not.

82.     Once Character began to undertake actions to effectuate the Agreement, namely, relinquishing its exclusive access to the leased computing clusters back to Applied—*access worth millions of dollars*—Applied was under an affirmative duty to disclose its alleged belief that the Agreement was subject to a condition precedent, Applied's failure to satisfy that condition precedent, and Applied's intent to continue to hold Character liable for payments under the Contract.

83.     Given Applied's allegation that it was always its belief that the Agreement was subject to a condition precedent, *see, e.g.*, Ex. G at ¶ 22, at the time Mr. Cummins stated that Applied should "plan for" the early termination of the Contract, and at the time Mr. Raza stated that Applied intended to release Character from the Contract when its prepayment ran out, Applied knew that those statements were false, or at the very least materially misleading.

84.     Instead, Applied intentionally remained silent to induce Character to relinquish its exclusive control of the leased computing clusters, which Character did on September 3, 2024.

85.     Given that Applied's own CEO, Mr. Cummins, had represented to Applied that it should "plan for" the early termination of the Contract and Character's payment obligations thereunder, in exchange for Character relinquishing its exclusive access to the computing clusters, and Applied's utter silence regarding the alleged condition precedent, it was reasonable for Character to rely on Applied's statements and both relinquish its exclusive access to the leased computing clusters and cease making payments under the Contract.

86.     That Applied also took actions in furtherance of the Agreement further supports

that Character's reliance on Applied's statements made throughout the parties' negotiations was reasonable, including Applied's failure to raise the alleged condition precedent at any time during those negotiations.  Applied did not just accept control of the leased computing clusters from Character, it formatted those clusters at Character's request, deleting any and all data Character had on those clusters, effectively rendering them useless to Character going forward.

87.    Had Applied informed Character, at any point, of the alleged condition precedent and Applied's failure to find a replacement customer, such that Character would have remained on the hook for payments under the Contract, Character could have continued to dedicate resources to utilizing the leased Applied clusters for its AI platform or taken other steps to make productive use of the computing capacity.  Instead, on the mistaken belief that relinquishing its exclusive access to the leased computing clusters back to Applied would relieve it of its obligations under the Contract, Character permitted Applied to delete data from the leased clusters, representing a significant amount of work undertaken by Character, dedicated employee resources to fully shift Character's AI platform to GCP, and thereafter sought, and acquired, additional computing power from third-party providers.  Unbeknownst to Character, Applied still intended to hold Character liable for full payment under the Contract for computing clusters to which Character no longer had exclusive access and, in fact, could not use.

## PRAYER FOR RELIEF

WHEREFORE, Character prays for judgment against Applied as follows:

(1)    For a declaration that the Agreement constitutes a binding and enforceable contract between the parties that modifies, or extinguishes, the parties' rights and obligations under the Contract;

(2)    In the alternative, a declaration that Character was excused from its obligations

under the Contract by virtue of Applied's own breach;

(3)      For specific performance of the Agreement;

(4)      For compensatory damages, the exact amount of which will be proven at trial;

(5)      For pre-judgement and post-judgment interest on such monetary relief;

(6)      The costs of bringing this suit, including reasonable attorneys' fees, to the extent

recoverable by law or pursuant to the parties' contractual relationship; and

(7)      For all other relief to which Character may be entitled at law or equity.

ASHBY & GEDDES, P.A.

Of Counsel:                                    /s/ *Catherine A. Gaul*
Justin Ehrlich                                 Catherine A. Gaul (#4310)
jehrlich@millerbarondess.com                   500 Delaware Avenue, 8th Floor
Christian P. Erwin                             Wilmington, DE  19899
cerwin@millerbarondess.com                     302.654.1888
Samantha Rifkin                                cgaul@ashbygeddes.com
srifkin@millerbarondess.com
MILLER BARONDESS, LLP                          *Attorneys for Character Technologies, Inc.*
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
(310) 552-4400

Dated:  June 13, 2025